Filed 1/31/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

AIRLINE PILOTS ASSOCIATION
INTERNATIONAL ET AL.,

      Plaintiffs and Respondents,

v.

UNITED AIRLINES, INC.,

      Defendant and Appellant.

A129914

(City & County of San Francisco
Super. Ct. No. CGC-07-468937)

## I. INTRODUCTION

California's Kin Care Law (Lab. Code, § 233) requires employers, who provide paid sick leave to their employees, to allow employees to use sick leave to care for family members. United Airlines, Inc. (United) seeks to avoid this state law obligation by the creation of an employee sick leave plan and trust, which United holds out as being subject to the Employee Retirement Income Security Act (ERISA) (29 U.S.C. §§ 1001 et seq.) and, thus, exempt from state regulation.

In ruling on cross-motions for summary judgment, the trial court determined, among other things, that application of the Kin Care Law to California domiciled pilots was not preempted by ERISA. United appeals, contending the trial court erred by concluding the plan and trust were not within the scope of ERISA and by ruling that the Airline Pilots Association International (ALPA) had standing to prosecute this case. We affirm.

## II. BACKGROUND

United maintains a paid sick leave plan for its pilot employees and has done so for at least ten years. The rate at which United's pilots accrue paid sick leave is established

1

by the collective bargaining agreement ("CBA") between ALPA and United. United "does 'not permit[ ] pilot employees to use accrued sick leave to attend to an illness of a child, parent, spouse, or domestic partner.' " Thus, for example, when plaintiff Captain Kathleen Wentworth (Wentworth) sought to use a portion of her accrued paid sick leave to care for her dying mother, United denied her request and instructed her to take time off without pay.

## A.     United's Sick Leave Plans and Trusts

In 1989, United created its Sick Leave Plan ("Plan") and Sick Leave Trust ("Trust"). United asserts that the " 'primary reason that [it] maintains the sick leave plan as an ERISA plan is so that it could provide uniform benefits and uniform administration to all its employees,' " without " 'having to comply with specific state laws applicable to sick leave[,]' " including California's Kin Care Law. United's Plan was amended in 2003 and was largely revised, in relevant part, after the instant action commenced. The revised Plan and Trust became effective July 2009.[1]

The Plan is part of United's Employee Welfare Benefit Plan. The Plan was designed "to provide sick leave benefits [ ] to the United employees . . . in the event of an employee's sickness . . . .' " The Plan states that it is intended to constitute an employee welfare benefit plan within the meaning of ERISA. Plan documents appoint a plan administrator and a fiduciary within the meaning of ERISA. From the beginning, the plan administrator has been a committee of United's employees. Since 2007, the plan administrator has been a committee called the Retirement and Welfare Administration Committee ("RAWAC"), comprised of United senior management employees.

The participants in the Plan include practically all of United's employee groups,

---

[1]     Although the 1989 Trust was amended in 2003, before it was substantially revised in 2009, those prior amendments do not affect the analysis here. When applicable, we shall refer to the Plan and Trust in effect prior to July 2009 as the "original" Plan and Trust and the Plan and Trust in effect beginning in July 2009 as the "revised" Plan and Trust.

including pilots. The Plan provides that sick leave benefits " 'shall be funded entirely' by [the] Trust, which 'itself shall be funded solely by Company contributions.' " The Plan also provides that sick leave will be paid at a pilot' s "regular rate of pay . . . up to the number of hours credited to [the pilot's] sick leave bank."

### 1. The Plan and Trust as it Existed Prior to 2009

The original Trust stated expressly that it was a "grantor trust."[2] According to the original Plan, United retained the ability to cease contributions to the Trust, if United decided it was impossible or inadvisable. Further, if United decided to cease making contributions, the Trust would attempt to pay out any sick leave owed to United employees. The original Plan also provided that if there were insufficient Trust assets to meet sick leave liability, United could "in its sole discretion, prescribe the rules for determining the priority of payment and allocation of available assets." Pursuant to the original Plan and Trust, assets held in the Trust would not "revert" to United. However, an exception existed, in the event United decided to terminate the Trust, and Trust assets exceeded the benefits to be paid, the Plan permitted the remaining assets to revert to United.

The original Trust also stated that the trustee had "no duty to require any contributions to be made to it or to determine that the contributions received by it comply with the provisions of the Plan . . . ." According to United, it had a funding policy under the original Trust, which used historical trends in sick leave usage to forecast the coming month's anticipated sick leave payments. United doubled this amount, and then added $1 million to determine its monthly contribution. This prior funding formula was not in writing.

---

[2] Later in the opinion, we provide an in-depth discussion regarding grantor trusts and their significance to the issues on appeal. For now, it is sufficient to note that the assets in a grantor trust are considered to be owned by the grantor. (See Mead, *A Primer in the Grantor Trust Rules* (1990) 69 Mich. B.J. 1152.)

## 2. *The Plan and Trust Since 2009*

United substantially revised the Trust in 2009. The revised Trust now provides that the trustee has a right to enforce a contribution obligation against United. United also hired an actuary to develop a funding formula and that funding policy was approved by the plan administrator. Under the revised Trust, United is required to make contributions to the Trust on a monthly basis in amounts calculated to ensure that the Trust will have sufficient money to cover one month's worth of sick leave payments.

However, the revised Plan still allows United, in its sole discretion, to cease making contributions to the Trust if it determines that contributions are impossible or inadvisable. United also retains a reversionary interest in trust assets, upon termination of the Trust and after all benefits owed are paid. According to the deposition testimony of Lincoln Lounsbury, United's senior counsel, the revised Trust, like the original Trust, is a grantor trust. Lounsbury further testified that United had not taken any steps to change the tax status of the Trust, and he confirmed that the Trust is "still a taxable trust."

## 3. *Payment Scheme under Both Trusts*

Pilots receive wage payments on the first and sixteenth days of each month. Sick leave benefits are paid to United's pilots along with their regular pay from one of three payroll accounts owned by United. The payroll account from which a particular pilot is paid, depends solely on whether the pilot is paid through direct deposit, a physical paycheck, or credit union. United transfers money from its main operating account to cover all payments made out of its payroll accounts. The Trust transfers money to United's main operating account in an amount sufficient to cover the current month's sick leave liability.

Under the original Trust, any sick leave pay owed to the pilots was paid on the sixteenth day of the month following the month in which the leave was taken, and was combined with the pilots' regular wages in one paycheck.

The original Trust provided that the Trustee was authorized " '[t]o make payments from the Trust Fund . . . to [United] as reimbursement for payments made to Plan participants or beneficiaries of the Plan' " and permitted " 'the payment of Trust assets to

4

[United] to reimburse [United] for plan benefits advanced to Plan participants or beneficiaries on behalf of the Plan or Trust.' " Generally, the original Trust transferred money for benefits to United a day or so in advance of the date the benefits were paid out. In some instances, however, the benefits were first paid by United and then later reimbursed by the Trust. For example, during the 64-month period between January 2003 and April 2008, United received reimbursement from the Trust after it had paid sick leave to pilots on 29 occasions; and received reimbursement on the same day as it made sick leave payments on another 27 occasions.

Pursuant to the revised Trust, United is required to make its contribution to the Trust by the fifth business day of each month, and the Trust now transfers money to United before United makes sick leave payments to its employees. United retains any interest earned on money transferred from the Trust and uses it to help fund the next due payment. Similarly, when a pilot receives sick leave pay and later receives workers' compensation or state disability for his or her absence, the pilot is required to turn over any workers' compensation or state disability payment back to United or the Plan; these returned payments are not credited to the Trust.

## C. *Commencement of Litigation*

In November 2007, three pilots and their union, ALPA (collectively plaintiffs), sued United, claiming various statutory violations associated with the Plan. Inasmuch as the instant appeal is limited to plaintiffs' first cause of action, we confine our discussion and analysis to plaintiffs' claim that United's policy and practice of prohibiting pilot employees from using accrued "sick leave" to care for ill family member violates California's Kin Care Law. (Lab. Code, § 233). Labor Code section 233 states that an employer that provides paid sick leave to employees must permit employees to use, in any calendar year, the amount of accrued sick leave the employee would accrue during six months of employment, to attend to an illness of the employee's child, parent, spouse, or domestic partner. Section 233 expressly excludes sick leave benefits provided under an employee welfare plan that qualifies as an ERISA plan. (Lab. Code, § 233, subd. (b).)

In October 2009, both sides moved for summary judgment. In its motion for summary judgment, United argued, among other things, that plaintiffs' claims were preempted under ERISA and that ALPA lacked standing to bring its claims. By their motion, plaintiffs argued, among other things, that the Plan, both in its original and revised form, did not qualify as an employee welfare benefits plan within the meaning of ERISA because: 1) the Plan was an exempt "payroll" practice; 2) the Trust was a mere "pass-through" for payments that offered no genuine protection for employees' sick leave benefits; and 3) the Trust did not offer actual protection for employees' benefits because, as a grantor trust, any money held in the Trust remained the property of United and subject to the claims of its creditors.

In granting summary adjudication to plaintiffs, the trial court held that ERISA did not preempt plaintiffs' claims because the Trust's assets were "reachable by United's creditors," and therefore the "employees' benefits remain[ed] tied to the financial health of United." Accordingly, the trial court concluded that the Trust was not really a " 'bona fide separate trust' " and failed to comply with the Department of Labor criteria for ERISA trusts.

### III. DISCUSSION

Despite the voluminous record on appeal and extensive briefing, this appeal raises essentially a single legal issue—namely, whether United's Plan, as funded by the Trust qualifies as an ERISA plan, thus preempting plaintiffs' Kin Care Law claim. For the reasons discussed below, we conclude that it does not. We begin our analysis with a brief review of the governing legal principles.

### A. *Standard of Review*

We review a grant of summary judgment de novo, considering " 'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.' " (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612.) "In independently reviewing a motion for summary judgment, we apply the same three-step analysis used by the superior court. We identify the issues framed by the

pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue." (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261.) If there is no triable issue of material fact, "we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by [the moving party] in the trial court or first addressed on appeal." (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071.)

## B.     ERISA

"ERISA is a comprehensive federal law designed to promote the interests of employees and their beneficiaries in employee pension and benefit plans. [Citation.] As a part of this integrated regulatory system, Congress enacted various safeguards to preclude abuse and to secure the rights and expectations that ERISA brought into being. [Citations.] Prominent among these safeguards is an expansive preemption provision, found at section 514 of ERISA (29 U.S.C. § 1144; [citations].)" (*Marshall v. Bankers Life & Casualty Co.* (1992) 2 Cal.4th 1045, 1050–1051.) That provision preempts "any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA. (29 U.S.C. § 1144(a).) The parties here vigorously dispute whether plaintiffs' claim relates to an employee benefit plan within the meaning of section 1144(a) and, hence, is preempted.

"The 'comprehensive and reticulated statute' [citation] contains elaborate provisions for the regulation of employee benefit plans." (*Massachusetts v. Morash* (1989) 490 U.S. 107, 113 (*Morash*).) However, as the United States Supreme Court has explained in *Morash*: "The precise coverage of ERISA is not clearly set forth in the Act. ERISA covers 'employee benefit plans,' which it defines as plans that are either 'an employee welfare benefit plan,' or 'an employee pension benefit plan,' or both. ERISA § 3(3), 29 U.S.C. § 1002(3). An employee welfare benefit plan, in turn, is defined as: [¶] '[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that

such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .' ERISA § 3(1), as codified, 29 U.S.C. § 1002(1)." (*Morash, supra,* 490 U.S. at p. 113, fn. omitted.)

The Act does not further define " 'plan, fund, or program' " or "benefits in the event of sickness" and does not specify whether every policy to provide benefits in the event of sickness fall within its ambit. (See, e.g., *Morash, supra,* 490 U.S. at pp. 113-115 [discussing Act's failure to further define "vacation benefits"].) The words "any plan, fund, or program . . . maintained for the purpose of providing . . . benefits in the event of sickness" may surely be read to encompass sick leave payments to an employee. (See *ibid.*) In this case, the Plan falls squarely within ERISA's definition of an employee welfare benefit plan, because it was established by an employer (United) to provide employees with certain welfare benefits, including sick leave pay. Moreover, there is no serious dispute that the sick leave plan is governed by formal plan documents, administered by a third-party claims administrator, provides for comprehensive administrative procedures for filing and adjudicating claims, and is otherwise held out as an ERISA plan.

However, a regulation of the Secretary of Labor excludes certain " 'payroll practice[s]' " from the application of ERISA. (*Bassiri v. Xerox Corp.* (9th Cir. 2006) 463 F.3d 927, 929; *Alaska Airlines v. Oregon Bureau of Labor* (9th Cir.1997) 122 F.3d 812, 812 (*Alaska Airlines*).) More specifically, the "payroll practices" exemption provides that an " 'employee welfare benefit plan' " for purposes of ERISA "shall not include . . . Payment of an employee's *normal compensation, out of the employer's general assets,* on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons . . . ." (29 C.F.R. § 2510.3–1(b)(2) (emphasis added).) Thus, the payroll

8

practices exemption would apply if (1) the payment of sick leave benefits under the Plan qualifies as "normal compensation" *and* (2) the sick leave benefits are paid from United's general assets.

Here, it is undisputed that at all times of the Trust's operation, sick leave benefits were and are paid as part of an employee's "normal compensation" and "out of the employer's general assets"—to wit, out of United's main operating account. Accordingly, the Plan falls squarely within the plain meaning of a payroll practice. This is not, however, the end of our analysis.

While Plan benefits do pass through United's general corporate account and are distributed along with regular wages, the Plan is funded by a valid Trust. (See *Morash, supra,* 490 U.S. at pp. 114-115 [finding a payroll practice where benefits were paid directly out of an employer's general assets, with no connection to any trust]; *Funkhouser v. Wells Fargo Bank, N.A.* (9th Cir. 2002) 289 F.3d 1137, 1142-1143 [same].) Moreover, the revised Trust is the sole source of funding for the Plan; general corporate assets are never directly used to pay Plan benefits. (See *Alaska Airlines, supra,* 122 F.3d at pp. 813-814 [finding a payroll practice where an employer sought reimbursement from the trust after paying benefits out of its general assets]; *Czechowski v. Tandy Corp.* (N.D.Cal. 1990) 731 F.Supp. 406, 408-409 [same].) And, although, under the original Trust, United occasionally sought reimbursement from the Trust after paying for the sick leave benefits out of its general assets, the general practice was to transfer money for benefits to United a day or so before the date the benefits were paid.

Payment from a separate fund certainly militates towards finding an employee benefit plan within the meaning of ERISA. (*Morash, supra,* 490 U.S. at p. 114.) However, as the Ninth Circuit explained in *Alaska Airlines, supra,* 122 F.3d 812, an employer must do more than create a separate fund for benefits payments to qualify for ERISA preemption; that separate fund must be *actually liable* for the benefits. (*Id.* at pp. 814-815.) For example, in *Alaska Airlines,* the airline created a welfare plan for the payment of sick leave and other employee benefits. (*Id.* at p. 813.) It also created a trust to administer the benefits payments. (*Ibid.*) Instead of paying sick leave benefits directly

9

from the trust, however, the airline entered into a repayment agreement with the trust, under which the airline paid sick leave benefits directly to employees from its general funds and then sought reimbursement from the trust. (*Ibid.*) The Ninth Circuit held that the airline's system of benefits payments was not an ERISA-regulated plan. (*Id.* at pp. 812, 815.) The court explained that the airline was not transmitting funds the trust had provided to pay the employee; rather, it was paying first, and seeking reimbursement later. (*Id.* at p. 814.) The court held that the airline's payment from its general assets qualified as a payroll practice under the plain words of ERISA. (*Ibid.*)

The court in *Alaska Airlines* did not, however, end its analysis there. Specifically, the court also concluded that the "substance" of the airline's plan was not necessarily one of a funded benefit program. (*Alaska Airlines, supra,* 122 F.3d at p. 814.) For example, there was no clear relation between the amount of funds in the trust and the sick leave liability accrued by the airline's employees. (*Ibid.*) Under the airline's plan, employees were dependent on the financial health of their employer, rather than the financial health of the trust, for their benefits payments. (*Ibid.*) Accordingly, the court found that the airline's system had more of the characteristics of an unfunded payment than of an ERISA trust fund payment. (*Ibid.*)

After the decisions in *Morash* and *Alaska Airlines*, the Department of Labor (DOL) issued several advisory opinions articulating a four-part test for determining whether a separate trust to pay vacation benefits is an "employee welfare benefit plan" under ERISA. (*See* DOL Advisory Opinion No. 2004–08A (Jul. 2, 2004) 2004 WL 2074325 ("Denny's Opinion"); DOL Advisory Opinion No. 2004–10A (Dec. 30, 2004), 2004 WL 3244869 ("May Company Opinion").) The DOL test provides: 1) the trust must have a legal obligation to pay plan benefits; 2) the employer must have a legal obligation to make contributions to the trust; 3) the contributions must be actuarially determined or otherwise bear a relationship to the plan's accruing liability; and 4) the trust paying the benefits must be a bona fide separate trust. (Denny's Opinion at *3.)

The Ninth Circuit has held that advisory opinions interpreting an ambiguous Labor regulation—such as the one before the Court—are controlling unless they are " 'plainly

10

erroneous or inconsistent with the regulation.' " (*Bassiri v. Xerox Corp., supra,* 463 F.3d at p. 931 citing *Auer v. Robbins* (1997) 519 U.S. 452, 461.)  Thus, providing that the DOL's interpretation of when an employee benefits plan is ERISA-regulated is not plainly erroneous or inconsistent with ERISA, then courts will apply the DOL test for ERISA-applicability to an employer's plan.

Here, after reviewing the applicable law and DOL advisory opinions, the trial court found that the DOL's interpretations regarding employee benefits were not plainly erroneous or inconsistent with ERISA.  The trial court then proceeded to apply the DOL's four-part test for determining whether a separate trust to pay sick leave benefits is an "employee welfare benefit plan" under ERISA.  The trial court determined the original Trust did not qualify as an ERISA plan because United's contributions were not actuarially determined and did not otherwise bear a resemblance to the original Plan's accruing liability.  In addition, the court found that neither the original nor the revised Trust qualified as ERISA plans because they were not bona fide separate trusts under the law.  After explaining that the trusts were grantor trusts under Internal Revenue Code section 671—which provides that trust assets are considered part of the employer's general assets, remaining subject to the claims of an employer's creditors in the case of insolvency— the trial court found that the trusts constituted payroll practices exempt from ERISA.

Accordingly, we must determine whether the Trust is merely a "pass through," considering whether the contributions to the original Trust were actuarially determined and whether the original or revised Trust qualifies as a bona fide separate fund.

## C.      *Funding for the Original Trust Was Not Actuarially Determined*

As noted, the trial court determined that United's Plan, as funded by the original Trust, did not fall within ERISA's ambit because, among other things, the original Trust

11

funding was not actuarially determined or otherwise commensurate with the Plan's accruing liability.[3] We agree.

*1. Background*

United maintains that its prior funding policy was a set formula under which United forecasted the coming month's anticipated sick leave payments using historical trends, doubling it, and adding $1 million. According to United, the "formula used past payments to participants to forecast payments required for upcoming payroll periods." This formula, however, was never reduced to a writing. Rather, United claims that the component of the formula that forecast upcoming sick leave was "embedded" in an Excel spreadsheet. The embedded formula was not known to United's treasury department employees who were responsible for transferring funds from the Trust to the Plan. For example, James Jazdzewski, a senior staff specialist in cash management, testified that he did not know how the formula worked. Rather, Jazdzewski input various figures, and the spreadsheet produced a number; he did not know what that number reflected. Not only did Jazdzewski not know how the contributions were calculated, he was also unaware of the time periods utilized in determining the historical data.

Soon after Lincoln Lounsbury joined United as senior counsel in 2006, he began speaking with various consulting firms regarding the review of the funding policy. At his deposition, Lounsbury explained that he contacted the consultants not because he thought the existing policy lacked actuarial analysis, but because "any policy whether actuarial determined or not has to be reviewed from time to time." Ultimately, United engaged the consulting firm Trion to review the funding policy and to make recommendations for appropriate changes and revisions.

Trion's actuary, Paul Hitchcox, testified that for a period of time prior to July 2009, the Excel spreadsheet was not functioning the way it had been designed to work. Specifically, Hitchcox testified that the prior funding method "produced a weekly

---

[3]     To the extent plaintiffs claim that the trial court erred in determining that the revised Trust was actuarially determined, that issue is not presently before us as plaintiffs have not appealed from that or any other ruling.

12

estimate of the sick leave payments. That weekly estimate was updated each month. The monthly update broke so it was frozen–the base that it worked from was frozen at some [unknown] point in time . . . and continued to use . . . an old number." Hitchcock characterized the former month-by-month plan as having "specious accuracy" and "arbitrary monthly adjustments with very little logic . . . to them."

       2.     *Analysis*

      "In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. [Citation.] To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." (*Morash, supra,* 490 U.S. at p. 115.) It stands to reason that one way of safeguarding against the mismanagement of funds is for the contributions to be actuarially determined or otherwise bear a relationship to the plan's accruing liability. (See *Alaska Airlines, supra,* 122 F.3d at p. 815; Denny's Opinon at *3.)

      Here, if the funding formula operated as United states it did (double forecast plus $1 million), it would seem to bear a relationship to the plan's accruing liability. However, the record indicates that United did not always use the same period of time to determine the forecast and that the factors used in the forecast were not entirely clear. Accordingly, the prior funding method produced arbitrary results. This suggests that the original Trust offered no real protection for employees' benefits. In other words, contributions to the original Trust did not bear a consistent relationship to the Plan's accruing liability. (See *Alaska, supra,* 122 F.3d at p. 815.) Without a consistent relationship to the accruing liability for benefits, the degree of risk depended on the financial health of United, not the Trust. (*Ibid.*) In sum, funding of the original Trust was not actuarially determined and did not otherwise bear a relationship to the Plan's accruing liability.

**D.** ***Neither the Original Trust nor the Revised Trust Are Bona Fide Separate Trusts***

  *1.*  *Grantor Trusts vs. Nongrantor Trusts*

  The Internal Revenue Code contains special rules, referred to herein as "grantor trust" rules, which treat certain grantors of trusts as the owners of all or certain portions of the property in those trusts. (See 26 U.S.C. (hereafter Int. Rev. Code) §§ 671-678.) The grantor is the person or corporation who actually places the funds in trust. (See Mead, *A Primer in the Grantor Trust Rules, supra,* Mich. B.J. at p. 1152.) The purpose of the grantor trust rules is to prevent the use of a temporary or incomplete transfer in trust as a means of tax avoidance. (*Crane v. Commissioner* (1st Cir. 1966) 368 F.2d 800, 802; *Scheft v. Commissioner* (1972) 59 T.C. 428, 431; 47B C.J.S. (2013) Internal Revenue, § 453, pp. 424-427.) Accordingly, the grantor trust rules attempt to determine when a trust should be respected for tax purposes and when it should be ignored. (Soled, *Reforming the Grantor Trust Rules* (2001) 76 Notre Dame L. Rev. 375, 379 (*Grantor Trust Rules*).) Specifically, the grantor trust rules recognize the separate existence of a trust when a grantor has parted with dominion and control over the trust corpus, but ignore the separate existence of a trust when the grantor has retained dominion and control over trust assets. (*Ibid.*) Thus, in computing income tax liability, grantors treated as trust owners are required under Internal Revenue Code section 671 to include income, deductions, and credits attributable to the portion of the trust owned. (Sollee et al., *Maximizing the Benefits of Deferred Compensation Plans Funded Through Secular Trusts* (Aug. 1992) 77 J. Tax'n 90 (Aug. 1992) No. 2, Compensation & Benefits at *5 (*Compensation & Benefits*).) One commentator has referred to Internal Revenue Code section 671 as making a trust function like a "spaghetti colander"—"[a]ll income, deductions, and credits against tax of a trust are poured in. If a taxpayer is treated as having dominion and control over all or a portion of a trust, then items of income, deductions, and credits against tax attributable to such ownership remain in the spaghetti colander and the taxpayer must take them into account in computing the taxpayer's taxes. The balance of income, deductions, and credits against tax drain through the spaghetti

14

colander and are taxed to the trust or trust beneficiaries . . . ." (Soled, *supra, Grantor Trust Rules*, 76 Notre Dame L. Rev. at pp. 389-390, fn. omitted.)

"By contrast, a nongrantor trust is a separate taxable entity distinct from the grantor and the trust beneficiaries. (*Compensation & Benefits, supra,* 77 J. Tax'n 90 at p. 5.) Generally, a nongrantor trust is taxed under the trust rules of Internal Revenue Code section 641, which generally conform with the rules for individuals. (*Ibid.*) To the extent income is distributed to beneficiaries, the trust is entitled to a deduction and the beneficiary is required to include the amounts in income, up to the taxable amount of the trust. (*Ibid.*)

In the employment context, employers often will establish a grantor trust and make contributions in the name of employee beneficiaries to create a source of funding for otherwise unfunded benefit plans. (See *In re Outboard Marine Corp.* (Bankr. N.D. Ill. 2002) 278 B.R. 778, 785.) Inasmuch as the trust corpus technically remains property of the employer, the employee beneficiaries of the trust are not taxed on their portion of the trust corpus or proceeds until the assets are actually distributed to the beneficiaries. (See Int. Rev. Code, 26 U.S.C. § 671 et seq.; *McAllister v. Resolution Trust Corp.* (5th Cir. 2000) 201 F.3d 570, 575 (*McAllister*).) However, as several circuit courts have explained, such advantageous tax treatment is not extended without certain strings attached. (*Goodman v. Resolution Trust Corp.* (4th Cir. 1993) 7 F.3d 1123, 1127 (*Goodman*); *McAllister, supra,* 201 F.3d at p. 575; *Resolution Trust Corp. v. MacKenzie* (2nd. Cir. 1995) 60 F.3d 972, 974 (*MacKenzie*).) "Federal tax law conditions the beneficial treatment of a grantor trust on the requirement that the trust fund remains subject to the claims of the employer's creditors as if the assets were the general assets of the employer. [Citations.])" (*Goodman, supra,* 7 F.3d at p. 1127.)

Here, it is undisputed that the trusts at issue are grantor trusts.[4] However, United insists that the trial court "incorrectly assumed" that the availability of trust assets to

---

[4]     Although in the trial court United disputed that the revised Trust was a grantor trust, on appeal United concedes that it is such a trust.

15

creditors is " 'an inherent feature' " of all grantor trusts. Rather, according to United, the availability of trust assets to creditors is an "inherent feature of only a species of grantor trusts, colloquially known as 'rabbi trusts.' " United maintains that although their trusts are grantor trusts, they are not, and have never been rabbi trusts.

2. *Rabbi Trusts vs. Secular Trusts*

a. Rabbi Trusts

The first rabbi trust was developed over thirty years ago by a congregation that wanted to provide for its rabbi after his retirement, while at the same time protecting him against any changes in control. (See Corporate Counsel's Guide to Nonqualified Deferred Compensation Agreements (Sept. 2012) (hereinafter Corporate Counsel's Guide) Part I, Chapter 6, Rabbi Trusts, § 6.3 Overview of rabbi trusts–The first "rabbi trust" (Overview); *In re Outboard Marine Corp., supra,* 278 B.R. at p. 785, fn. 6.) "Although the trust agreement did not allow the congregation to alter, amend, revoke, change, or annul any of the trust's provisions, it provided that the trusts assets would be subject to the congregation's creditors, just as if the assets remained among the general assets of the congregation." (Overview, *supra*, § 6.3.) Additionally, the rabbi's interest in the trust was not subject to assignment, alienation, or attachment, nor to the claims of the rabbi's creditors, and it could not otherwise be alienated or encumbered by the rabbi. (*Ibid.*)

Responding to a request for a determination as to whether the rabbi would be deemed in receipt of current income by virtue of the "funding" of the trust for his benefit, the Internal Revenue Service (IRS), in a private letter ruling,[5] determined that the rabbi would not be in receipt of current income regarding trust assets that were subject to

---

5      IRS private letter rulings have no precedential value. (Int. Rev. Code, § 6110(k)(3).) However, they may be used to show how the IRS has ruled on an issue, to illustrate inconsistent interpretation, or to trace the development of the IRS's interpretation of an issue. (See *Amergen Energy Co., LLC v. United States* (Fed. Cl. 2010) 94 Fed. Cl. 413, 418-419 (*Amergen*); 13 Mertens Law of Fed. Income Tax'n, § 47:154.)

congregation's creditors and that were not paid or made available to the rabbi. (I.R.S. Priv. Ltr. Rul. (hereinafter "PLR") 81-13-107 (Dec. 31, 1980) [1980 WL 137740].) The IRS concluded that the rabbi would not be in receipt of income until the year that the payments were actually received by or otherwise made available to the rabbi. (*Id.* at * 2.)

Today, the term "rabbi trust" is synonymous with a "grantor trust . . . in which an employer makes contributions to the trust in the name of beneficiaries to create a source of funding for otherwise unfunded benefit plans. Because the trust corpus technically remains property of the employer," the trust beneficiaries are not taxed on their portion of trust assets or trust corpus "until the assets are actually distributed to the beneficiaries." (*In re Outboard Marine Corp., supra,* 278 B.R. at p. 785.) Moreover, as a condition of this beneficial tax treatment, "rabbi trusts are required to remain at all times subject to the claims of the grantor's general creditors." (*Ibid.*)

### b. Secular Trusts

Some employers have used "secular trusts" to protect their employees against both changes of control and corporate insolvency issues. (Corporate Counsel's Guide, Part I, Chapter 2, Securing Nonqualified Deferred Compensation, § 2:4 Secular trusts.) A secular trust is so named to distinguish it from the rabbi trust. (*Ibid.*) The key distinction between rabbi trusts and secular trusts is that secular trust assets are separated from the employer's assets, and cannot be reached by the company's creditors. (*Ibid.*) Thus, a secular trust not only protects against nonpayment due to a change in control, but also secures payments against the employer's insolvency or bankruptcy. (*Ibid.*) This protection, however, comes with a price. A secular trust results in immediate taxation to employees based on the employer's trust contributions in the year they are contributed, prior to the employee's actual receipt of benefits. (*Ibid.*)

Here, it is undisputed that the assets and income attributable to the Trust are taxable to United under Internal Revenue Code section 671. United concedes the Trust is a grantor trust—i.e. owned by its creator, and it is taxed as such. Yet, United insists that its grantor trusts are not rabbi trusts because the trust assets are not subject to the claims of its creditors. However, the IRS's position is that an employees' trust—i.e., one that

17

accumulates funds to pay benefits to employees and cannot be reached by employer's creditors, *cannot be treated as a grantor trust owned by the employer.* (Sollee, *Compensation & Benefits, supra,* 77 J. Tax'n at p. 91; PLR 92-06-009 (Nov. 11, 1991); PLR 92-07-010 (Nov. 12, 1991), PLR 92-12-019 (Dec. 20, 1991); PLR 92-12-024 (Dec. 20, 1991).) In other words, the IRS no longer permits a secular trust to be treated as an employer-grantor trust. (See Corporate Counsel's Guide, Part I, Chapter 7, Secular Trusts, § 7:12 Tax ramification of trust income–End of employer-grantor secular trusts.)

    *3.    Analysis*

    United acknowledges the IRS position[6] on secular employer-grantor trusts, but maintains that this issue is irrelevant in the instant case because the challenged trusts do not involve retirement or deferred compensation plans. According to United, the tax implications of the grantor trust rules have no bearing here because the Plan and Trust do not involve deferred income. We disagree.

    ERISA was implemented to safeguard employees from the abuse and mismanagement of funds accumulated to finance employee benefits. (*Morash, supra,* 490 U.S. at p. 112.) ERISA defines an employee benefit plan as "an employee welfare benefit plan *or* an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." (29 U.S.C. § 1002(3), italics added.) Although the topic of grantor trusts arises most frequently in the context of deferred compensation plans (see *Goodman, supra,* 7 F.3d at p. 1127 [discussing deferred compensation agreements]; *MacKenzie, supra,* 60 F.3d at p. 974 [discussing deferred executive compensation plans]; *McAllister, supra,* 201 F.3d at p. 572-575 [discussing supplemental executive retirement plan], there is nothing to suggest that the federal interest in regulating grantor trusts is limited to cases involving deferred compensation.

---

[6]    In our request for supplemental briefing, we asked United to explain how its sick leave trusts can be considered grantor trusts without being considered rabbi trusts, in light of the IRS's position that employer-grantor secular trusts are no longer recognized.

For example, in *Shoars v. Providian Bancorp Services* (N.D.Cal. 2003) 2003 WL 26111761 (*Shoars*),[7] the district court considered a vacation and sick-leave plan similar to United's Plan. There, as here, the plan was funded by a separate trust that was for the sole benefit of the employee plan participants. (*Id.* at *2.) The employer, Providian, retained the right to terminate the trust, and upon termination any outstanding balance would revert to the employer. (*Ibid.*) There was no explicit provision stating that Providian owned the trust or that trust assets would be subject to Providian's creditors. (*See id.* at * 2, 4.) Providian argued that under state law the trust would only be subject to the claims of creditors to the extent of the company's interest in the trust assets. (*Id.* at *4.) Rejecting this argument, the court explained that notwithstanding the predominance of state law with respect to creating and defining property interests, such interests "are only defined by state law '[i]n the absence of any controlling federal law . . . .' (*Barnhill v. Johnson* [(1992)] 503 U.S. 393, 398.)" (*Id.* at *5.) Citing *Goodman, supra,* 7 F.3d at page 1127, the district court determined there was "a clearly articulated federal interest in treating the assets in a grantor trust as part of the employer's general assets: '[f]ederal tax law conditions the beneficial tax treatment of a grantor trust on the requirement that the trust fund remains subject to the claims of the employer's creditors as if the assets were the general assets of the employer.' [Citation.]" (*Shoars, supra,* at *5.) The court further found that neither state law nor the terms of the plan and trust overcame this federal interest. (*Ibid.*)

In this case, as in *Shoars*, there is a clearly articulated federal interest in treating the assets in the grantor trusts as part of United's general assets, and thus subject to the

---

[7] Although we may not rely on unpublished California cases, the California Rules of Court do not prohibit citation to unpublished federal cases, which may properly be cited as persuasive, although not binding, authority. (Cal. Rules of Court, rule 8.1115; *In re Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18; *Landmark Screens, LLC v. Morgan, Lewis & Bockius, LLP* (2010) 183 Cal.App.4th 238, 251, fn. 6; *Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1352, fn. 6.)

claims of United's creditors. Contrary to United's suggestion, the grantor trust rules are not limited to the *type of benefit* to be funded. Rather, the critical issue is the *ownership* of the trust. Here, it is undisputed that United is the owner of the trusts and it has included the trusts' income on its own tax returns, and has paid taxes on that income. Equally established is that United employees are not taxed on this income until the time of distribution. United's position that the trusts' assets are not subject to United's creditors is fundamentally inconsistent with the tax treatment of United as the owner of the trusts. The beneficial tax treatment of a grantor trust is conditioned on "the requirement that the trust fund remains subject to the claims of the employer's creditors as if the assets were the general assets of the employer. [Citations.])" (*Goodman, supra,* 7 F.3d at p. 1127.)

In a series of private letter rulings addressing deferred compensation plans, the IRS has taken the position that grantor trusts cannot exist without there being a rabbi trust. (See Rabitz, *An Overview Concerning Certain Recent Changes for Foreign Compensatory Trusts: 402(B) Trusts, Grantor Trusts and "Rabbi" Trusts* (1999) 4 Fla. Tax Rev. 429, 479; PLR, *supra,* 92-06-009; PLR, *supra,* 92-07-010; PLR, *supra,* 92-12-019; PLR, *supra,* 92-12-024.) Although private letter rulings have no precedential value and do not in any way bind this court, they are, nevertheless, an instructive tool regarding the IRS's thinking about a particular issue, which in the instant case is the topic of employer-grantor trusts. (See *Amergen, supra,* 94 Fed. Cl. at pp. 418-419); *Thom v. United States* (8th Cir. 2002) 283 F.3d 939, 943, fn. 6.)

United makes much of the fact that the grantor trusts at issue fund employee welfare benefit plans and not retirement or deferred compensation plans subject to Internal Revenue Code sections 402(a) and 402(b); this, however, is a distinction without a difference. Indeed, the IRS has applied the same reasoning set forth in its rulings on deferred compensation secular employer-grantor trusts to an employee welfare benefit plan and determined that an employer-secular grantor trust was "fundamentally inconsistent with the treatment of the employer as the owner of the trust" under the grantor trust rules. (PLR 93-25-050 (Mar. 30, 1993) [1993 WL 222191] at *12-13.)

20

That the grantor trusts at issue fund welfare benefit plans as opposed to a pension or other type of traditional deferred compensation plan cannot overcome the federal interest in treating the assets in trusts as part of United's general assets. In light of this interest, the assets in the trusts must be available to United's creditors in the event of insolvency, thus leaving employees' sick leave benefits at risk until the moment the benefits are actually paid. A benefit plan is beyond the scope of ERISA if the degree of risk that employees will not be paid benefits "depend[s] on the financial health of the employer, not the fund." (*Alaska Airlines, supra,* 122 F.3d at p. 815.)

Accordingly, we conclude ERISA preemption does not apply in the instant case. (See *Morash, supra,* 490 U.S. at pp. 115-116.)

### E.     *Standing*

United argues that ALPA lacks standing to sue under the Kin Care Law. " '[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " (*Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1341, quoting *Warth v. Seldin* (1975) 422 U.S. 490, 499.) Nevertheless, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." (*Warth, supra,* 422 U.S. at p. 511.) "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Hunt v. Washington Apple Advertising Comm'n* (1977) 432 U.S. 333, 343 (*Hunt*); see *Brotherhood of Teamsters & Auto Truck Drivers v. Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1521-1522 (*Brotherhood of Teamsters*.) Thus, "[u]nder the doctrine of associational standing, an association that does not have standing in its own right may nevertheless have standing to bring a lawsuit on behalf of its members." (*Amalgamated Transit Union, Local , AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003 (*Amalgamated Transit*).)

United acknowledges that a labor union, such as ALPA, may have associational standing in some instances, but asserts that in *Amalgamated Transit, supra,* 46 Cal.4th 998, the California Supreme Court foreclosed ALPA's standing in the instant case. We disagree.

In *Amalgamated Transit*, two labor unions and seventeen individuals filed suit against transit company employers, alleging that the employers failed to provide employees with meal and rest periods as required by law, and seeking unpaid wages, and civil penalties. (46 Cal.4th at pp. 998-999.) Plaintiffs asserted violations of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL) and the Labor Code Private Attorney General Act of 2004 (Lab. Code, § 2698 et seq. (PAGA)), seeking injunctive relief, restitution, and civil penalties. (*Id.* at pp. 998-1000.) As relevant here, the court addressed whether a plaintiff labor union that had not suffered actual injury under the UCL, and that was not an " 'aggrieved employee' " under the PAGA could nevertheless bring a representative action under those laws either as an assignee of employees who had suffered an actual injury and who were aggrieved employees, or as an association whose members had suffered actual injury and were aggrieved employees. (*Id.* at p. 998.) Before delving into this issue, the court summarized the relevant aspects of the UCL and the PAGA, to wit: The UCL allows a private party to bring an unfair competition action on behalf of others, but only if the person " 'has suffered injury in fact and has lost money or property as a result of the unfair competition.' " (*Amalgamated Transit, supra,* 46 Ca1.4th at p.1000.) Also, the PAGA provides that an " 'aggrieved employee' " may bring an action to recover civil penalties for violations of the Labor Code " 'on behalf of himself or herself and other current or former employees.' " (*Id.* at p. 1001.) After determining that the UCL and PAGA claims were not assignable, the court held that the unions had no standing to maintain the actions as entities in their own right. (*Id.* at pp. 1003-1005.) In so holding, the court rejected the application of the doctrine of associational standing in that case, explaining that the unions neither suffered an " 'injury in fact' " for UCL purposes nor could they be considered "aggrieved employee[s]" under PAGA. (*Id.* at pp. 1004-1005.)

22

Contrary to United's contention, *Amalgamated Transit* is not dispositive of the issue on appeal. As the trial court correctly determined, under the express holding of *Amalgamated Transit*, ALPA failed to qualify for associational standing under the UCL because it suffered no injury in fact. The instant case, however, does *not* involve the UCL or the PAGA. Rather, our case turns on whether an employer may avoid the application of the Kin Care Law under the guise of ERISA.

The Kin Care Law provides that "[a]ny employee aggrieved by a violation of this section shall be entitled to reinstatement and actual damages or one day's pay, whichever is greater, and to appropriate equitable relief." (Lab. Code, § 233, subd. (d).) By contrast, the PAGA permits a civil action "by an aggrieved employee on behalf of himself or herself and other current or former employees" to recover "civil penalties" for violations of other provisions of the Labor Code. (Lab. Code, § 2699, subds. (a) & (i).) Although the Kin Care Law and PAGA both reference employees who are "aggrieved" (see Lab. Code, §§ 233, subd. (d); 2699, subds. (a) & (c)), "[t]he purpose of the PAGA is not to recover damages or restitution, but to create a means of 'deputizing' citizens as private attorneys general to enforce the Labor Code. (See Nicholson, *Businesses Beware: Chapter 906 Deputizes 17 Million Private Attorneys General to Enforce the Labor Code* (2004) 35 McGeorge L.Rev. 581.)" (*Brown v. Ralphs Grocery Co.* (2011) 197 Cal.App.4th 489, 501-502.) Indeed, our Supreme Court has noted that the Legislature specified that "it was . . . in the public interest to allow aggrieved employees, acting as private attorneys general to recover civil penalties for Labor Code violations . . . ." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980) and that "an action to recover civil penalties 'is fundamentally a law enforcement action designed to protect the public and not to benefit private parties' [citation]." (*Id.* at p. 986.)

The instant case has none of the hallmarks of a law enforcement action under the PAGA. ALPA is not seeking civil penalties on behalf of the general public for United's violation of the Kin Care Law. Rather, ALPA seeks *equitable* relief for the benefit of its members, i.e.—private parties. Specifically, ALPA, acting in its representative capacity, seeks restitution, injunctive relief, and a declaratory judgment that United's policy of

23

denying pilot employees the right to use sick leave to care for an ill child, parent, spouse, or domestic partner violates the Kin Care Law. Seeking relief on behalf of employees with respect to Labor Code violations committed by an employer is a "union's fundamental purpose." (See *Professional Fire Fighters, Inc. v. Los Angeles* (1963) 60 Cal.2d 276, 284, overruled on another point in *Bishop v. City of San Jose* (1961) 1 Cal.3d 56, 63, fn. 6 (union had standing to seek declaratory and injunctive relief for Labor Code violation; see also *Monterey/Santa Cruz County Bldg. & Constr. Trades Council v. Cypress Marina Heights LP* (2011) 191 Cal.App.4th 1500, 1521-1522) (union had standing to bring prevailing wage claim on behalf of members; *Brotherhood of Teamsters, supra,* 190 Cal.App.3d at pp. 1521-1524) (unions had standing to bring mandate petition on behalf of members who had been denied unemployment insurance benefits during lockout period).)

Nothing in the PAGA purports to limit the decades of California case law finding that a union has associational standing to sue on behalf of its members where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Hunt, supra,* 432 U.S. at p. 343; see *Brotherhood of Teamsters, supra,* 190 Cal.App.3d at pp. 1521-1522.) The instant action indisputably satisfies the criteria for associational standing.

Accordingly, the trial court correctly determined that ALPA has standing to bring claims for declaratory and injunctive relief under the Kin Care Law.[8]

## IV. DISPOSITION

---

[8] United does not challenge the trial court's ruling that plaintiffs' Kin Care claim may proceed as a representative action without complying with class action requirements. (See *Amalgamated Transit, supra,* 46 Cal.4th at p. 1005 [UCL actions brought on behalf of others, including those by representative or associational plaintiffs must be brought as class actions]; *Arias v. Superior Court, supra,* 46 Cal.4th at pp. 978-980 [same].) Accordingly, we express no opinion on this issue.

The judgment is affirmed.  Plaintiffs are entitled to their costs on appeal.

_____

REARDON, J.

We concur:

_____

RUVOLO, P. J.

_____

HUMES, J.

*Airline Pilots v. United Airlines* A129914

Trial Court: City and County of San Francisco Superior Court

Trial Judge: Hon. Charlotte Woolard

Counsel for Defendant and Appellant:
Seyfarth Shaw LLP
Robert W. Tollen
Eden Anderson

Counsel for Respondents:
Altshuler Berzon LLP
Stephen P. Berzon
Barbara J. Chisholm

Airline Pilots Association, International
Russell Woody
Elizabeth Ginsburg

*Airline Pilots v. United Airlines* A129914