[No. B179133. Second Dist., Div. Three. Jan. 30, 2006.]

APARTMENT ASSOCIATION OF LOS ANGELES COUNTY, INC., et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

COUNSEL

Rockard J. Delgadillo, City Attorney, Claudia McGee Henry, Assistant City Attorney, and Gerald M. Sato, Deputy City Attorney, for Defendant and Appellant.

Neighborhood Legal Services of Los Angeles County, Rocio Y. Garcia, David Pallack; National Housing Law Project, Catherine Bishop; Legal Aid Foundation of Los Angeles, A. Christian Abasto; Los Angeles Housing Law Project, Roderick T. Field; Bet Tzedek Legal Services, Mitchell A. Kamin, Michelle Williams Court and Elissa D. Barrett as Amici Curiae on behalf of Defendant and Appellant.

California Apartment Law Information Foundation, Trevor A. Grimm and Craig Mordoh for Plaintiffs and Respondents.

OPINION

**KLEIN, P. J.**—Defendant and appellant City of Los Angeles (the City) appeals a judgment in a declaratory relief action invalidating a municipal ordinance.

The City adopted an ordinance prohibiting a landlord, after termination or nonrenewal of a Section 8 housing contract with the City's Housing Authority, from charging the tenant more than the tenant's portion of the rent under the former contract, without any limitation as to time. We conclude the ordinance conflicts with, and is preempted by, Civil Code section 1954.535, which provides that for a period of *90 days* following receipt of the notice of termination or nonrenewal of the contract, a tenant "shall not be obligated to pay more than the tenant's portion of the rent" under the former contract.

Therefore, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Overview of Section 8 housing program.*[1]

The housing assistance program commonly known as Section 8 is funded by the United States Department of Housing and Urban Development (HUD)

---

[1] This overview of the Section 8 program is drawn in part from the Web site of the Housing Authority of the City of Los Angeles. (<http://www.hacla.org/section8/home.htm> [as of Jan. 30, 2006].)

to provide rental assistance to senior citizens, disabled or handicapped persons and very low income tenants. HUD channels money to housing authorities, provides technical assistance and training, and monitors housing authority compliance with program requirements and goals. Rather than being provided with a specific unit at a subsidized housing site, Section 8 participant-tenants receive vouchers to contract for housing with participating landlords. Locally, Section 8 is administered by the Housing Authority of the City of Los Angeles (Housing Authority).

Because the need for Section 8 vouchers greatly exceeds their availability, applicants are assigned to a waiting list. When an eligible applicant reaches the top of the waiting list, the applicant receives a voucher. The voucher assists the applicant in renting a privately owned dwelling. The dwelling the applicant chooses must meet Section 8 housing quality standards and the owner of the dwelling must agree to abide by HUD/Section 8 regulations. Section 8 tenants pay about 30 percent of their income towards their rent and HUD, via the Housing Authority, pays the rest of the rent to the owner.

The Section 8 tenant finds housing much like anyone else. The Section 8 tenant must pay a portion of the rent, adhere to the lease and HUD's Lease Addendum requirements, and cooperate with the Housing Authority in annual inspections and income and rent reviews.

The Section 8 owner functions as a landlord in the private rental market. The owner signs a lease with the Section 8 tenant (which includes a HUD Lease/Tenancy Addendum) and also signs a housing assistance payments (HAP) contract with the Housing Authority. Pursuant to the HAP contract, the Housing Authority makes housing assistance payments to the Section 8 owner.

> 2. *In response to removal of numerous housing units from Section 8 program, City Council adopts an ordinance prohibiting a landlord from terminating (or not renewing) its rental assistance contract with the Housing Authority, and then requiring the tenant to pay rent in excess of the tenant's share of the rent under the former contract.*

In April 2002, in response to the withdrawal by landlords of numerous housing units from the Section 8 program, the Los Angeles City Council adopted Ordinance No. 174501 (the 2002 Ordinance) amending Los Angeles Municipal Code (Municipal Code) section 151.04. As amended, Municipal Code section 151.04, found within the Rent Stabilization Ordinance (Mun. Code, ch. XV), provides: "A. It shall be unlawful for any landlord to demand, accept or retain more than the maximum adjusted rent permitted pursuant to this chapter or

regulation or orders adopted pursuant to this chapter. [¶] B. *It shall be unlawful for any landlord to terminate or fail to renew a rental assistance contract with the Housing Authority of the City of Los Angeles (HACLA), and then demand that the tenant pay rent in excess of the tenant's portion of the rent under the rental assistance contract.*" (Mun. Code, § 151.04, amended by Ord. No. 174,501, eff. Apr. 11, 2002, italics added.)

The 2002 Ordinance includes the following statement of intent: "It is the intent of the City Council that a landlord cannot bring an action to recover possession of a rental unit on the ground that the tenant has failed to pay rent to which the landlord is entitled, if the landlord has terminated or failed to renew a rental assistance contract with the Housing Authority of the City of Los Angeles (HACLA), then demanded that the tenant pay rent in excess of the tenant's portion of the rent under the rental assistance contract and subsequently refused to accept rental assistance paid by HACLA. The affirmative defense to an unlawful detainer proceeding provided for in Section 151.09 E shall apply to any of these proceedings not reduced to final judgment as of the operative date of this amending ordinance."

The 2002 Ordinance was adopted as an urgency measure to take effect immediately upon publication. In this regard, the Ordinance states: "During the past few months, numerous landlords have changed the terms of an existing tenancy, such that Section 8 tenants could not continue to pay their rent through the Section 8 voucher program. Accordingly, the institution of a 'no Section 8' policy has resulted in many tenants appearing to be 'voluntarily vacating' their rental units during the term of an existing tenancy, thereby allowing the landlord, as a practical matter, to raise the rent in violation of state law and the [Rent Stabilization Ordinance]. It is impossible to track and enforce these violations. The institution of the 'no Section 8' policy has resulted in the cancellation of approximately 6,000 contracts and displacement of thousands of tenants. There are no available housing units for these displaced tenants because of general unavailability of affordable housing and limitations based on their income. [¶] Therefore, in order to prevent the displacement of tenants who could not otherwise be forced to move, it is necessary that this affirmative defense be made available to those tenants who currently face possible displacement as a result of a 'no Section 8' policy. It is the intent of the City Council that the affirmative defense to an unlawful detainer provided for in Section 151.09 E shall apply to these proceedings not reduced to final judgment as of the operative date of this amending ordinance."

### 3. *The complaint for declaratory relief.*

On August 2, 2002, within four months of the adoption of the new 2002 Ordinance, plaintiffs Apartment Association of Los Angeles County, Inc.,

doing business as Apartment Association of Greater Los Angeles, Apartment Association of San Fernando Valley/Ventura and Ferrell Burton, III, filed a complaint for declaratory and injunctive relief, challenging the validity of the ordinance. The associations are membership trade organizations representing numerous owners and managers of residential rental property in the City and are subject to the City's Rent Stabilization Ordinance. Burton owns rental property in the City.

Plaintiffs alleged, inter alia, the 2002 Ordinance's mandated reduction in the amount of rent that an owner can collect for the occupancy of rental property after a lawful nonrenewal of a HACLA contract constitutes a taking of the owner's property without just compensation in violation of the state and federal Constitutions. Further, the setting of the monthly rent at a fraction of its fair market value, without regard to the reasonable rental value of the property and bereft of any factual or economic basis for the fractional amount set, is arbitrary, capricious, punitive and in violation of the Rent Stabilization Ordinance, which guarantees an owner will be allowed a just and reasonable return.

### 4. *Proceedings.*

On March 26, 2004, the matter came on for trial. The parties agreed the case involved issues of law only and that they would submit the matter on the trial briefs that were filed. The matter was taken under submission. On July 2, 2004, the trial court issued a tentative ruling, concluding the 2002 Ordinance was preempted by state law. The trial court requested the parties to submit supplemental briefing on the preemption issue. The parties then filed supplemental briefs on that issue.

The City's papers took the position Civil Code section 1954.535 does not preempt the 2002 Ordinance. "because the Legislature did not intend to fully occupy the area of sudden rent increases. The state statute sets forth notice guidelines for sudden rent increases that could follow a landlord's cancellation of a rental assistance contract whereas the City's Ordinance provides rent stabilized tenants with an affirmative defense [to] illegal rent increases. By allowing the statute and the ordinance to coexist, the public policy of locally controlling rent regulations is best served."

Plaintiffs, in turn, argued state law, specifically, Civil Code sections 1954.53 and 1954.535, fully regulate the termination of Section 8 tenancies, and the legislative history reflects the restriction upon rent collected from the tenant must be limited to 90 days.

### 5. *Trial court's ruling and judgment.*

The tentative ruling, which essentially became the final ruling in the matter, sets forth the trial court's reasoning with respect to the preemption issue.

In its ruling, the trial court found the preemption issue was dispositive. It noted, "[w]hile there were several issues raised by the parties (i.e., whether the challenged ordinance exceeds the City's police power, constitutes an impairment of contract or a taking), it is the Court's . . . conclusion that the ordinance in question is preempted by state law.

"A conflict between state and local law exists when a local law serves the same purpose as the state law but provides additional tenant protection. [Citation.] [¶] The ordinance in question in this case . . . is in conflict with state law. [¶] Civil Code section 1954.535 provides: [¶] 'Where an owner terminates or fails to renew a contract or recorded agreement with a governmental agency that provides for rent limitations to a qualified tenant, the tenant or tenants who were the beneficiaries of the contract or recorded agreement shall be given at least 90 days' written notice of the effective date of the termination and shall not be obligated to pay more than the tenant's portion of the rent, as calculated under the contract or recorded agreement to be terminated, for 90 days following receipt of the notice of termination of nonrenewal of the contract.

"The purpose of the statute, according to the legislative history, is to protect tenants from sudden price increases that force them to move. [¶] . . . [¶] Civil Code section 1954.535 . . . protects tenants by giving them 90 days before they have to pay more than the portion of the rent they previously paid. The Ordinance at issue imposes the same restriction *but without a time limit.* [¶] . . . [¶] . . . The purpose of the Ordinance appears to the Court to be identical to the purpose of the state law, i.e. protection of tenants from sudden significant rent increases; but the Ordinance provides no time limitation. (Thus, a tenant could remain in a unit paying only a small percentage of the market value of the rent for many years if he or she so chose.) [¶] . . . [¶]

"Rent Control is certainly not a 'fully occupied area' of state law; localities have considerable control. But when the issue becomes narrower[,] how much rent a landlord can charge after a rental assistance contract is canceled, . . . it does not seem to this Court that the Legislature could have *intended for the specific time limitation it imposed to be directly contradicted* by local law. If the Legislature did not intend for a time limit to be imposed, it would not have included one at all. It is well established that statutes must be construed so that none of the language is superfluous: to hold that the state

law and the city ordinance do not conflict would be to render the 90-day limit in Civil Code section 1954.535 superfluous. [¶] As such, the Court concludes that the state and local laws conflict, and thus the local Ordinance is preempted." (Italics added.)

On August 31, 2004, the trial court entered judgment declaring Ordinance No. 174501, the 2002 Ordinance, and Municipal Code section 151.04.B are preempted by state law and "therefore, . . . void, invalid and of no force nor effect . . . ."

This appeal followed.

## CONTENTIONS

The City contends plaintiffs lack standing to prosecute this action, and Municipal Code section 151.04 is not preempted by Civil Code section 1954.535.[2]

## DISCUSSION

1. *Plaintiffs have standing to maintain this action.*

The City contends plaintiffs lack standing because they pled no more than they have members who own dwellings which are or may be subject to the City's rent stabilization ordinance. According to the City, no actual or imminent actual injury caused by the enactment of Municipal Code section 151.04 is alleged, and in the absence of any such allegation, plaintiffs lack standing to mount their facial challenge to the validity of the 2002 Ordinance. As explained, the City's challenge to plaintiffs' standing is without merit.

---

[2] We also take note of the City's contention a landlord that terminates its participation in Section 8 and then demands the tenant pay the total amount the tenant and the Housing Authority previously had paid together has subjected the tenant to an excessive rent increase. According to the City, it is a rent increase because in a Section 8 tenancy, only the tenant's portion of the amount due the landlord is deemed "rent."

The City's contention that only the Section 8 tenant's portion of the payment to the landlord is deemed "rent" is belied by the language of Municipal Code section 151.04.B., which states: "It shall be unlawful for any landlord to terminate or fail to renew a rental assistance contract with the Housing Authority of the City of Los Angeles (HACLA), and then demand that the tenant pay rent *in excess of the tenant's portion of the rent* under the rental assistance contract." (Italics added.)

Thus, the Municipal Code recognizes the rent payment to the landlord consists of two components: the Housing Authority's portion of the rent and the tenant's portion of the rent. Therefore, the mere fact a landlord terminates participation in the Section 8 program and then looks to the tenant for the entire rent payment does not mean there has been any increase in the rent.

a. *The City is entitled to raise the issue of standing for the first time on appeal.*

As a preliminary matter, we note the City's challenge to the plaintiffs' standing is being raised for the first time at the appellate level. However, the issue of standing is properly before us.

A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on its merits. (*Hernandez v. Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 71 [164 Cal.Rptr. 279].) Standing goes to the existence of a cause of action (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 862, p. 320), and the lack of standing may be raised *at any time* in the proceedings. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499]; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 438 [261 Cal.Rptr. 574, 777 P.2d 610].) Therefore, the City's challenge to plaintiffs' standing is properly before this court.

b. *No merit to City's challenge to plaintiffs' standing to sue.*

Municipal Code section 151.10 sets forth remedies for violation of the provisions of the Rent Stabilization Ordinance. A landlord who demands, accepts or retains any payment in excess of the amount allowed by the Rent Stabilization Ordinance "shall be liable in a civil action" for damages of three times the amount of the excess rent. (Mun. Code, § 151.10.A.) In addition, a landlord who violates section 151.04 *"shall be guilty of a misdemeanor."* (Mun. Code, § 151.10.B., italics added.) Thus, an owner who terminates a Section 8 contract and then charges the tenant rent in excess of the tenant's portion of the rent under the rental assistance contract, in violation of Municipal Code section 151.04.B., faces very serious consequences.

" 'Declaratory relief has . . . been used in California to challenge the constitutionality of penal statutes and ordinances (*Portnoy v. Superior Court,* 20 Cal.2d 375, 378 [125 P.2d 487]; *LaFranchi v. City of Santa Rosa,* 8 Cal.2d 331 [65 P.2d 1301]; *Sandelin v. Collins,* 1 Cal.2d 147 [33 P.2d 1009]). See also the following cases holding that declaratory relief is a proper vehicle for testing the validity of statutes of a nonpenal nature: *Salsbery v. Ritter,* 48 Cal.2d 1, 7 [306 P.2d 897]; *Bess v. Park,* 132 Cal.App.2d 49 [281 P.2d 556]; *Mefford v. City of Tulare,* 102 Cal.App.2d 919 [228 P.2d 847]; *Monahan v. Department of Water & Power,* 48 Cal.App.2d 746, 751 [120 P.2d 730]; *Andrews v. City of Piedmont,* 100 Cal.App. 700 [281 P. 78]). The theory of these cases was perhaps best expressed by Borchard in his book on Declaratory Judgments (1934) where he pointed out (p. 278) that to exclude examination of penal statutes from the operation of declaratory relief is like

"telling the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool is to eat it." ' (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 678, fn. 2 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].)" (*Hooper v. Deukmejian* (1981) 122 Cal.App.3d 987, 1017 [176 Cal.Rptr. 569].)

■ Further, " ' "[a]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." ' [Citation.]" (*Driving Sch. Assn. of Cal. v. San Mateo Union High Sch. Dist.* (1992) 11 Cal.App.4th 1513, 1517 [14 Cal.Rptr.2d 908].) Here, the association plaintiffs satisfy all three criteria. Their individual members could have challenged the validity of the 2002 Ordinance in their own right, the right to a fair rent is germane to the association plaintiffs' organizational purpose and their facial challenge to the validity of the Ordinance does not require the participation of any individual members.

We conclude plaintiffs had standing to bring this action and turn to the merits of the appeal.

   2. *Trial court properly found the 2002 Ordinance is preempted by Civil Code section 1954.535.*

      a. *Standard of review.*

The issue of preemption of a municipal ordinance by state law presents a question of law, subject to de novo review. (*Horton v. City of Oakland* (2000) 82 Cal.App.4th 580, 584 [98 Cal.Rptr.2d 371].)

      b. *General principles.*

■ " ' "Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations]." ' [Citations.]" (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 423 [261 Cal.Rptr. 384, 777 P.2d 157].)

" 'In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: "(1) the subject matter has been so fully and completely covered by general law as to clearly

indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." ' [Citations.]" (*Western Oil & Gas Assn. v. Monterey Bay Unified Air Pollution Control Dist., supra,* 49 Cal.3d at p. 423.)

> c. *State law fully occupies the field of the length of time a tenant's rent payment is frozen following notice of termination or nonrenewal of a Section 8 agreement.*

Civil Code sections 1954.53 and 1954.535, which are the pertinent sections here, are found within the Costa-Hawkins Rental Housing Act (Costa-Hawkins Act). (Civ. Code, § 1954.50, added by Stats. 1995, ch. 331, § 1, p. 1820.) The Costa-Hawkins Act generally established vacancy decontrol for residential units and preempts local rent control by permitting landlords to set the initial rent for vacant units. (*Bullard v. San Francisco Residential Rent Stabilization Bd.* (2003) 106 Cal.App.4th 488, 489–491 [130 Cal.Rptr.2d 819].)

Civil Code section 1954.53 provides in relevant part at subdivision (a): "Notwithstanding any other provision of law, an owner of residential real property may establish the initial rental rate for a dwelling or unit, *except where any of the following applies:* [¶] (1) The previous tenancy has been terminated by the owner by notice pursuant to Section 1946.1 or has been terminated upon a change in the terms of the tenancy noticed pursuant to Section 827, except a change permitted by law in the amount of rent or fees. For the purpose of this paragraph, the owner's termination or nonrenewal of a contract or recorded agreement with a governmental agency that provides for a rent limitation to a qualified tenant, shall be construed as a change in the terms of the tenancy pursuant to Section 827. [¶] (A) In a jurisdiction that controls by ordinance or charter provision the rental rate for a dwelling or unit, an owner who terminates or fails to renew a contract or recorded agreement with a governmental agency that provides for a rent limitation to a qualified tenant may not set an initial rent for three years following the date of the termination or nonrenewal of the contract or agreement. For any new tenancy established during the three-year period, the rental rate for a new tenancy established in that vacated dwelling or unit shall be at the same rate as the rent under the terminated or nonrenewed contract or recorded agreement with a governmental agency that provided for a rent limitation to a qualified tenant, plus any increases authorized after the termination or cancellation of the contract or recorded agreement. [¶] (B) Subparagraph (A) does not apply to

any new tenancy of 12 months or more duration established after January 1, 2000, pursuant to the owner's contract or recorded agreement with a governmental agency that provides for a rent limitation to a qualified tenant, unless the prior vacancy in that dwelling or unit was pursuant to a nonrenewed or canceled contract or recorded agreement with a governmental agency that provides for a rent limitation to a qualified tenant as set forth in that subparagraph." (Italics added.)

■ Thus, Civil Code section 1954.53 addresses the operation of vacancy decontrol following the termination or nonrenewal of a rental assistance contract between a landlord and a governmental agency.

For purposes of the issue before us, the key provision is Civil Code section 1954.535, which provides: "Where an owner terminates or fails to renew a contract or recorded agreement with a governmental agency that provides for rent limitations to a qualified tenant, the tenant or tenants who were the beneficiaries of the contract or recorded agreement shall be given at least 90 days' written notice of the effective date of the termination *and shall not be obligated to pay more than the tenant's portion of the rent, as calculated under the contract or recorded agreement to be terminated, for 90 days following receipt of the notice of termination of nonrenewal of the contract.*" (Italics added; added by Stats. 1999, ch. 590, § 3.)[3]

---

[3] The legislative history of Civil Code section 1954.535 indicates: "According to [the bill's] proponents, a significant number of landlords in rent control jurisdictions have terminated their agreements with the federal government to provide Section 8 housing to take advantage of the total phase-in of decontrol provisions of the Costa-Hawkins Act. In a publication by one property owners association, landlords were advised that 'owners in the future will have clear incentives to take their units out of Section 8 rental in order to put them on the decontrolled rental market.' [¶] With new 'opt-out' rules which now permit a landlord to terminate a Section 8 housing agreement with the federal government on 30 days notice, the publication stated that '[e]specially as 1999 approaches, owners would be wise to reevaluate their Section 8 tenancies and to consider whether they would do better with market rents and normal tenants.' The article further explained that under strict rent controls, Section 8 rents were generous as compared to rents under strict local controls. With those controls being lifted by Costa-Hawkins, 'Section 8 rents in the future will in general not be generous as compared to vacancy decontrolled rents.' [(]Article by Michael St. John in The BPOA Monthly, February 1997.[)] [¶] Proponents say that this loophole was clearly not intended and should not be permitted. Allowing a landlord to get a decontrolled rent when he terminates his Section 8 contracts and causes the tenant's eviction is not a voluntary vacancy by the former tenant. It is no different, [argue] proponents of this bill, than when a termination is achieved by the landlord unilaterally issuing a thirty-day termination notice or by changing the terms of the tenancy in a manner which makes it impossible for the tenant to stay. The legislature recognized the potential for abuse and mischief in those cases and specifically provided that those terminations are not voluntary vacancies. Section 8 terminations are analogous, say proponents, and it is vitally necessary to close the loophole to prevent landlords from arbitrarily terminating their Section 8 tenants in order to get a decontrolled unit. [¶] Proponents assert that the current requirement of a thirty-day notice is insufficient time for a Section 8 tenant to find replacement income and housing when the

The question presented, therefore, is whether, as the City argues, Municipal Code section 151.04 can be reconciled with Civil Code section 1954.535. We conclude it cannot.

■ As noted, the 2002 Ordinance makes it "unlawful for any landlord to terminate or fail to renew a rental assistance contract with the Housing Authority of the City of Los Angeles (HACLA), *and then demand that the tenant pay rent in excess of the tenant's portion of the rent under the rental assistance contract.*" (Mun. Code, § 151.04.B., italics added.)

Civil Code section 1954.535, which addresses the identical subject, protects tenants by giving them *90 days* following receipt of notice of termination or nonrenewal of the contract before they have to pay more than the portion of the rent they previously paid. As the trial court herein observed, "[t]he Ordinance at issue imposes the same restriction [as the statute,] but without a time limit. [¶] . . . [¶] . . . The purpose of the Ordinance appears to the Court to be identical to the purpose of the state law, i.e. protection of tenants from sudden significant rent increases; but the Ordinance provides no time limitation."

The Legislature, in Civil Code section 1954.535, specified the period of time a tenant's rent payment is frozen following termination or nonrenewal of a Section 8 agreement—90 days following receipt of notice of termination or nonrenewal. Because the Legislature has fully occupied the field in this area, Municipal Code section 151.04.B., the 2002 Ordinance, which purports to confer greater protections upon the tenant by freezing the tenant's payment beyond 90 days, and apparently indefinitely, is preempted.

3. *Analogous case:* Javidzad.

We note the question presented herein, relating to a conflict between local and state law is similar to *Javidzad v. City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350]. The statute in issue there was the Ellis Act (Gov. Code, § 7060 et seq.), which provided in relevant part: "No public entity . . . shall . . . compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease." (§ 7060, subd. (a).)

---

property decides to no longer accept Section 8 housing vouchers, thereby forcing the tenant to move. ⁓ assert that *this proposal, requiring 90 days notice of the effective date of the landlord's termination or nonrenewal of a Section 8 agreement and freezing the tenant's rent for that period, does not impose an undue burden on the property owner.* The only burden is to advise the affected tenants of the owner's decision sixty days earlier, thereby giving the affected tenants more time to prepare. This is fair, assert the proponents, given the tight market for low-income housing and the unique relationship between the Section 8 tenant and his or her landlord." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Aug. 31, 1999, pp. 5–7, italics added.)

The Ellis Act expressly states the Legislature's intent to "permit landlords to go out of business." (Gov. Code, § 7060.7.) Notwithstanding the Ellis Act, a provision of the Santa Monica City Charter required a landlord seeking to withdraw a controlled rental unit from the housing market to obtain a removal permit from the Santa Monica Rent Control Board prior to removal of the unit from the rental housing market. (*Javidzad v. City of Santa Monica, supra,* 204 Cal.App.3d at p. 526, fn. 3.)

This court rejected Santa Monica's assertion the charter provision was consistent with the Ellis Act. We found the charter provision "does prescribe standards governing the Board's approval of a removal permit in the first instance and thus infringes on a landlord's decision to go out of the rental housing business and thereby directly conflicts with the Act. [¶] . . . [¶] . . . Denying a . . . removal permit to a landlord who has gone out of the rental housing business imposes a prohibitive price on the exercise of the right under the Act. [Santa Monica's] continued adherence to the removal permit requirement after the Legislature has spoken flouts the will of that body in adopting the Act." (*Javidzad v. City of Santa Monica, supra,* 204 Cal.App.3d at pp. 530–531.)

■ The instant 2002 Ordinance is similarly flawed. Despite a landlord's recognized right to terminate or to refuse to renew a Section 8 contract, Municipal Code section 151.04.B. imposes a prohibitive burden on the exercise of that right by making it *unlawful* for the landlord, following termination or nonrenewal of the contract, to demand the tenant pay rent in excess of the tenant's portion of the rent under the former contract, without any limitation as to time. Clearly, Municipal Code section 151.04.B. conflicts with Civil Code section 1954.535 and therefore is preempted.

### 4. *Remaining issues not reached*

The City contends Municipal Code section 151.04.B., although it prohibits a landlord from demanding a tenant pay more than the tenant's portion of the rent under the former Section 8 contract, does not deprive landlords of their right to a fair return on their property, in that rent increases may be obtained, inter alia, through upward adjustments in the exercise of administrative discretion and hearings. In view of our conclusion that Municipal Code section 151.04.B. is preempted by state law, it is unnecessary to reach this or any other issues.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Croskey, J., and Kitching, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 10, 2006, S141888. George, C. J., did not participate therein.