Filed 2/22/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| UNITED FARMERS AGENTS ASSOCIATION, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FARMERS GROUP, INC. et al., <br><br> Defendants and Respondents. | B282541 <br><br> (Los Angeles County Super. Ct. No. BC497447) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gregory W. Alarcon, Judge.  Affirmed.

Mahoney & Soll, Paul M. Mahoney and Richard A. Soll for Plaintiff and Appellant.

Hinshaw & Culbertson, Royal F. Oakes, Michael A.S. Newman; Greines, Martin, Stein & Richland and Robert A. Olson for Defendants and Respondents Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and Farmers New World Life Insurance Company.

Tharpe & Howell, Christopher S. Maile, Eric B. Kunkel and William A. Brenner for Defendant and Respondent Farmers Group, Inc.

_____

Plaintiff United Farmers Agents Association, Inc. (UFAA) is a trade association whose members are insurance agents. It brought this declaratory relief action against Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and Farmers New World Life Insurance Company (the Companies) as well as Farmers Group, Inc. (FGI).  After a bench trial, the court found UFAA lacked standing to pursue its claims and failed to demonstrate it was entitled to declaratory relief.  The court entered judgment in favor of the defendants, and UFAA appealed.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Parties*

The Companies are a group of insurers that mutually contract to sell insurance products through independent-contractor insurance agents.[1]  FGI provides the Companies non-claim related administrative and management services.  It is the attorney-in-fact of Farmers Insurance Exchange, and the parent company of the attorneys-in-fact of Fire Insurance Exchange and Truck Insurance Exchange.

UFAA is a nonprofit professional trade association whose members are insurance agents that sell the Companies' insurance products.  It has approximately 1,900 members, 600 of whom are located in California.

### *Agent Appointment Agreements*

In order to sell the Companies' insurance products, an agent must enter into a form "Agent Appointment Agreement," which defines the terms and conditions of the agent's relationship

---

[1]     We use the terms "agent" and "agency" in their colloquial senses.

to the Companies. This case concerns several contractual terms common to Agent Appointment Agreements signed prior to 2009 (the Agreements), some of which date back to the 1970s.

Under the Agreements, agents must extend the right of first refusal to the Companies to bind insurance coverage on behalf of applicants solicited and procured by the agents. In exchange, the Companies pay commissions and provide agents advertising assistance, educational and training programs, and necessary manuals, forms, and policyholder records.

The Agreements require agents "provide the facilities necessary to furnish insurance services to all policyholders of the Companies including . . . servicing all policyholders of the Companies in such a manner as to advance the interests of the policyholders, the Agent, and the Companies." The Agreements further state that an agent "shall, as an independent contractor, exercise sole right to determine the time, place and manner in which the objectives of this Agreement are carried out, provided only that the Agent conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents."

The Agreements allow any party to terminate the contract by giving three months' written notice (the no-cause termination provision). However, if a party breaches the Agreement, the other party may terminate the Agreement on 30 days' written notice. The Companies may also terminate the Agreement immediately if the agent embezzles funds, switches insurance to another carrier, abandons the agency, is convicted of a felony, or makes willful misrepresentations material to the operation of the agency.

If the Agreement is terminated by any party, the agent generally is entitled to "contract value," which amounts to approximately one year's worth of commissions. In exchange, the agent must agree not to solicit, accept, or service his or her customers for a period of one year.

### *Complaint*

On December 17, 2012, UFAA filed a complaint alleging the Companies and FGI (collectively, Farmers)[2] engage in numerous practices that violate the terms of the Agreements.[3] In relief, UFAA sought four declarations from the court: (1) the Agreements' no-cause termination provisions are unconscionable; (2) the Agreements preclude Farmers's use of performance programs and imposition of discipline based on an agent's failure to meet performance standards; (3) the Agreements preclude Farmers from taking adverse action against agents based on the "location, nature, hours, and types of offices maintained" by the agents; and (4) the Agreements preclude Farmers from sharing customer information acquired by agents with competitors, such as 21st Century Insurance (21st Century).

### *Trial*

The court conducted a bench trial over the course of three weeks. We summarize the relevant evidence related to each claim.

---

[2]    We refer to the defendants collectively only for the sake of simplicity. We do not mean to imply they are a single entity or enterprise.

[3]    We discuss the nature of the alleged practices in more detail below.

*Unconscionability of the No-Cause Termination Provisions*

On the unconscionability issue, the court heard testimony from numerous Farmers representatives[4] that it was Farmers's policy to read an Agreement to an agent line-by-line before the agent signed the Agreement. The Agreements were presented on a take-it-or-leave-it basis, meaning the agents were not allowed to change any language.

Several agents testified that, before signing the Agreements, Farmers representatives made additional representations about the termination provisions. Multiple agents, for example, said they were told Farmers would only terminate an agency if the agent engaged in one of the behaviors expressly prohibited by the Agreements. Another agent said she was told Farmers would never terminate an Agreement under the no-cause termination provision because it would constitute discrimination. Others said they were simply told Farmers does not enforce the no-cause termination provision.

In response, Farmers presented testimony from representatives who were present while hundreds of agents signed their Agreements. The representatives said they had never witnessed an agent being told an agency would be terminated only for reasons specifically listed in the Agreements. Farmers also introduced testimony from three agents who said they did not discuss the no-cause termination provisions with a Farmers representative prior to signing their Agreements.

---

[4]     For the sake of simplicity, we use the term "Farmers representative" to refer to individuals affiliated with Farmers who are not UFAA members.

*Performance Standards*

Numerous agents testified that they had meetings with Farmers representatives to discuss their poor sales of new policies and retention of existing policies. After the meetings, each agent received a letter with the following language: "[Y]ou have been experiencing a loss of policies in force, insufficient new business production and/or low policy retention are significant factors contributing to this loss of policies. . . . [¶] . . . Based on the overall business results generated by your agency, please be advised that continuation of your Agent Appointment Agreement depends on your ability to immediately achieve a significant improvement in your agency's business results." Some of the agents' Agreements were eventually terminated.

Farmers did not dispute that it considers an agent's performance when deciding whether to terminate an Agreement. Numerous Farmers representatives testified that, in determining whether to terminate an Agreement, they consider whether the agent has achieved an "acceptable business result." In making that determination, they look at the agent's "overall business results," including sales of new policies, retention of existing policies, and profitability. They do not, however, impose any specific production requirements or sales quotas.

*Office Locations*

UFAA presented testimony from two agents whose Agreements were terminated, at least in part, because they were operating their agencies out of personal residences. A Farmers district manager also testified that an agent in his district had been terminated for operating an agency out of her home, and another had been terminated for using a shipping store as an office address. He explained that Farmers prefers agents work

out of commercial office buildings, in part because it does not want clients "to be walking through somebody's living room to meet with their agent."

The director of FGI's home office agencies testified that Farmers does not have a policy regarding the type of office space an agent must use, but it does require that the space be professional and adequate for servicing policyholders. The director explained that, because an agent must accept premium payments from any Farmers policyholder, it is important that the agent's office is identifiable as a location where Farmers business is conducted.

The head of commercial sales for FGI testified that Farmers does not condone agents working out of personal residences, but it may be acceptable depending on the circumstances and whether the agent is meeting the needs of customers. He explained that he has seen situations where agents have built additions onto their homes to use as private offices, which allowed the agents to conduct business with their customers in a professional environment.

Farmers's expert testified that it is normal for exclusive agency insurance carriers, like Farmers, to require their agents conform to good business practices. In the expert's opinion, it is not a good business practice, and it is not in the best interests of the customers or the insurance companies, for a customer to have to go into a personal residence to do business with the agent.

*Sharing of Customer Information*

The court heard testimony that 21st Century is owned by some of the Companies and managed by FGI. Unlike the Companies, 21st Century is a direct writer of insurance, meaning it markets directly to consumers for the acquisition of new

7

business. As a result, it is able to offer lower premiums than insurance companies that sell through agents. Customers can contact 21st Century and purchase insurance from it over the phone and the internet.

The court heard testimony that agents are required to enter their customers' information into Farmers's electronic database. Several Farmers representatives testified that Farmers does not share such information with 21st Century.

Farmers agent Thana Robinson, however, suspected Farmers shared her customers' information with 21st Century. According to Robinson, she wrote an insurance policy for two customers, which was in effect for a year. Robinson expected the customers would renew the policy, but they did not. Instead, the customers were issued a new policy, which had a "J-code" in Farmers's database. Robinson was not certain precisely what the J-code signified, but she believed it meant the customers obtained the new policy through 21st Century. Robinson admitted she did not know if 21st Century obtained the customers' information through the database.

Farmers agent Jose Soberanes also suspected Farmers was sharing customer information with 21st Century. According to Soberanes, he would frequently provide quotes to prospective customers and enter their information into Farmers's database. A few months later, he would call the customers, only to be told they had obtained insurance from 21st Century.

***Statement of Decision and Judgment***

After trial, the court issued a detailed statement of decision, in which it found in Farmers's favor on each claim. At the outset—and as discussed more fully below—the court determined that UFAA lacked standing to pursue its claims.

8

Although this finding was sufficient to warrant dismissal, the court nonetheless proceeded to consider the merits of UFAA's claims.

The court first determined that UFAA failed to demonstrate the no-cause termination provision is unconscionable. The court explained: "UFAA's members reported having varying experiences as to what, if anything, was said about the three-month written termination provision, and what was said to them about the contract in general. UFAA's procedural unconscionability theory rests on the premise all of its California member agents were orally told the same thing at the time of signing the [Agreements]. . . . The evidence did not support this."

The court next determined that, because UFAA failed to show the no-cause termination provisions are unconscionable, its claims related to Farmers's performance and office standards necessarily fail as well. The court explained: "If, as the [Agreement] permits, [Farmers] can terminate the [Agreement] on three-months' notice, for no reason at all, the fact that they have or even let others know, some criteria (e.g., performance results, business practices) that they consider in the exercise of their unbridled discretion does not make those factors improper. To the contrary, it protects [the] use of such factors as wholly within their unconstrained discretion."

Even without the no-cause termination provisions, the court found Farmers's alleged use of performance and office standards does not violate the Agreements. It explained that, as the principal, Farmers has "the right to set expectations about how much insurance is to be sold for the relationship to continue, even if the contract allows the agent to determine the time, place

and manner in meeting those expectations. [Farmers has] the right to expect positive business results and to determine what constitutes adequate results." The court further explained that the Agreements require agents to comply with "normal good business practices, and to all State and Federal laws governing the conduct of [Farmers] and their Agents." The court found the evidence on what constitutes a "normal good business practice" demonstrated that it encompasses an appropriate business location and normal business hours. Accordingly, "[a]sking the agent to maintain an office outside the home and to maintain normal business hours is not at variance with the agreement."

With respect to the claim that Farmers improperly shared customer information with 21st Century, the court found UFAA presented "no admissible or credible evidence of any instance where customer information was disseminated to 21st Century" by Farmers.

Finally, the court declined UFAA's invitation to find that FGI and the Companies are a single enterprise.

### *Judgment, Motion for New Trial, and Appeal*

On February 14, 2017, the court entered judgment in favor of Farmers and against UFAA. UFAA moved for a new trial, which the court denied on April 19, 2017. UFAA timely appealed.

## DISCUSSION

## I.     UFAA Had Standing to Pursue Some of Its Claims

Before considering the merits of UFAA's claims, we must first determine whether it had standing to assert them. We find UFAA had associational standing to pursue its claims related to performance and office standards, but did not have standing to pursue its other claims.

10

## A. Standard of Review

Standing is a question of law that we review independently. (*San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73.) "However, where the superior court makes underlying factual findings relevant to the question of standing, we defer to the superior court and review the findings for substantial evidence." (*Ibid.*)

## B. Associational Standing

"A litigant's standing to sue is a threshold issue to be resolved before the matter can be reached on its merits. [Citation.] Standing goes to the existence of a cause of action [citation], and the lack of standing may be raised at any time in the proceedings." (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2006) 136 Cal.App.4th 119, 128, italics omitted.)

" '[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' " (*Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1341.) The doctrine of associational standing is an exception to this general rule. It provides that, even in the absence of injury to itself, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." (*Hunt v. Washington Apple Advertising Comm'n* (1977) 432 U.S. 333, 343 (*Hunt*).) These are often referred to as the *Hunt* requirements.

11

The doctrine of associational standing "was developed in the federal courts under the 'case or controversy' requirement of article III of the United States Constitution." (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003.) Nonetheless, California courts have applied the doctrine, including the three *Hunt* requirements. (See, e.g., *Airline Pilots Assn. Internat. v. United Airlines, Inc.* (2014) 223 Cal.App.4th 706, 726; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles, supra*, 136 Cal.App.4th at p. 129; *Brotherhood of Teamsters & Auto Truck Drivers v. Unemployment Ins. Appeals Bd.* (1987) 190 Cal.App.3d 1515, 1521; see also *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court, supra,* 46 Cal.4th at p. 1003.) We consider federal case law concerning associational standing persuasive, although not binding. (See *Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1234, disapproved on other grounds in *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 169–170.)

### C. Analysis

The trial court determined that UFAA lacked standing because it failed to satisfy the third *Hunt* requirement, that "neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." Although the court gave multiple reasons for its decision, it seemed to be motivated in large part by a belief that associational standing is lacking if the participation of any association member is necessary to adjudication of the claim. This interpretation of the third *Hunt* requirement was too restrictive.

The United States Supreme Court has explained that the third *Hunt* requirement "is best seen as focusing on . . . matters of administrative convenience and efficiency." (*Food and Commercial Workers v. Brown Group, Inc.* (1996) 517 U.S. 544, 557.)  Although it could be read as foreclosing associational standing if *any* individual member participates in the lawsuit, federal courts have found associational standing despite the need for participation of *some* individual members.  (See, e.g., *Hospital Council v. City of Pittsburgh* (3d Cir. 1991) 949 F.2d 83 (*Hospital Council*); *Pennsylvania Psychiatric v. Green Spring Health* (3d Cir. 2002) 280 F.3d 278 (*Pennsylvania Psychiatric*); *Retired Chicago Police Ass'n v. City of Chicago* (7th Cir. 1993) 7 F.3d 584 (*Retired Chicago Police Ass'n*); *Association of Amer. Physicians v. Texas Medical* (5th Cir. 2010) 627 F.3d 547 (*Amer. Physicians*).)

In *Hospital Council, supra*, 949 F.2d 83, for example, the Third Circuit held that an association of hospitals had standing to pursue claims that governmental entities were forcing its members to make payments in lieu of taxes, despite the fact that adjudication of the claims would likely require trial testimony from the member hospitals' officers and employees.  The court explained that the third *Hunt* requirement is a paraphrase of a prior statement by the Supreme Court that associational standing is appropriate unless "the individual participation of each injured party [is] *indispensable* to proper resolution of the cause." (*Warth v. Seldin* (1975) 422 U.S. 490, 511, italics added.)  Therefore, the court reasoned, the participation of *some* members is not fatal to associational standing, so long as the participation of *each* member is not required.  (*Hospital Council, supra*, 949 F.2d at pp. 89–90.)  In a subsequent decision, the Third Circuit further clarified that associational standing may be appropriate

13

where the plaintiff alleges "systemic policy violations that will make extensive individual participation unnecessary." (*Pennsylvania Psychiatric, supra*, 280 F.3d at p. 286.)

The Seventh Circuit adopted the Third Circuit's interpretation of the third *Hunt* requirement in *Retired Chicago Police Ass'n, supra*, 7 F.3d 584. In that case, the court found an association had standing to pursue its claim that a city breached certain binding representations made to its members, despite the fact that it might need to rely on evidentiary submissions of some of its members to establish the breach. (*Id*. at p. 603.) The court explained: "We can discern no indication . . . that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association. Such a stringent limitation on representational standing cannot be squared with the Court's assessment in *Brock*[5] of the efficiencies for both the litigant and the judicial system from the use of representational standing. Rather, the third prong of *Hunt* is more plausibly read as dealing with situations in which it is necessary to establish 'individualized proof,' [citation], for litigants not before the court in order to support the cause of action." (*Retired Chicago Police Ass'n, supra*, 7 F.3d at pp. 601–602, fn. omitted.)

The Fifth Circuit considered the issue more recently in *Amer. Physicians, supra*, 627 F.3d 547. In that case, an association of physicians sought declaratory and injunctive relief related to a medical board's alleged improper use of anonymous complaints and retaliatory actions against its member physicians. After looking to *Hospital Council* and *Retired Chicago Police Association*, the court concluded the association

---

5       *Automobile Workers v. Brock* (1986) 477 U.S. 274.

14

had standing. The court explained: "If practiced systemically, such abuses may have violated or chilled [the association's] members' constitutional rights. Proof of these misdeeds could establish a pattern with evidence from the Board's witnesses and files and from a small but significant sample of physicians. Because [the association] also seeks only equitable relief from these alleged violations, both the claims and relief appear to support judicially efficient management if associational standing is granted." (*Amer. Physicians, supra*, 627 F.3d at p. 553.)

We find the federal courts' reasoning in these cases persuasive and adopt their interpretation of the third *Hunt* requirement. Accordingly, the fact that UFAA relied on testimony from some of its members to support its claims is not dispositive. Instead, we must determine whether UFAA's claims and requested relief required extensive participation from, or individualized proof related to, its agent members, keeping in mind the focus of the requirement is administrative convenience and efficiency.

## 1. UFAA Had Standing to Pursue its Claims Related to Office Locations and Performance Standards

UFAA argues it had standing to pursue its claims related to office locations and performance standards because it was possible to establish the claims without individualized factual inquiries related to each agent.[6] We agree.

With respect to these claims, UFAA essentially sought declarations that the Agreements categorically forbid Farmers from terminating an agency based, in whole or in part, on its dissatisfaction with the agent's office location or failure to meet

---

[6] Farmers does not address this issue in its respondent's brief.

15

performance standards. Farmers did not dispute that it considers such factors when deciding whether to terminate an Agreement, and has, in fact, terminated Agreements for such reasons. The only issue before the court, therefore, was whether the Agreements permit Farmers to terminate agencies for such reasons. To decide that issue, the court needed only interpret and construe the terms of the Agreements; it did not need to consider evidence related to individual agents or the specific circumstances under which their agencies were terminated. The claims, therefore, satisfied the third *Hunt* requirement, and UFAA had standing to pursue them.[7]

### 2. UFAA Lacked Standing to Pursue its Unconscionability Claim

UFAA lacked associational standing to pursue its claim seeking a declaration that the no-cause termination provisions are unconscionable.[8]

---

[7] The parties do not dispute that these claims satisfied the other *Hunt* requirements.

[8] lthough UFAA generally argues that the court erred in finding it lacked associational standing, it does not specifically address why it had standing to pursue its unconscionability claim. Even though standing is an issue we review independently, we are not required to develop UFAA's arguments for it, and its failure to provide reasoned argument and citations to authority has forfeited the point. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["[a]lthough our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief"]; *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 [" 'This court is not inclined to act as counsel for . . . any appellant and furnish a legal argument as to how the trial court's rulings in this regard

A court may refuse to enforce contracts or clauses in contracts that are unconscionable. (Civ. Code, § 1670.5, subd. (a).) " '[U]unconscionability has both a "procedural" and a "substantive" element,' the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results. [Citation.] 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114, abrogated on other grounds by *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333.)

An unconscionability claim typically cannot be resolved simply by examining the face of the contract. (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1147.) This is because "[u]nconscionability is a flexible standard in which the court looks not only at the complained-of term but also at the process by which the contractual parties arrived at the agreement and

constituted an abuse of discretion' [citation], or a mistake of law."].) Nonetheless, we will exercise our discretion to consider the issue, as its resolution impacts UFAA's other claims.

17

the larger context surrounding the contract, including its 'commercial setting, purpose, and effect.' [Citations.]" (*De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 976.) An unconscionability determination is "highly dependent on context," (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 911) and "requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided." (*Sonic-Calabasas A, Inc. v. Moreno, supra*, 57 Cal.4th at p. 1146.)

Given the nature of an unconscionability determination— particularly the focus on the circumstances of the contract's formation and sliding scale approach—in most cases it will be difficult, if not impossible, for an association to establish its members' contracts are unconscionable without individualized proof and the participation of each member. While there may be limited circumstances under which it is possible, this is plainly not one of those cases.

Although UFAA provided multiple reasons why the no-cause termination provisions are unconscionable—among them, that agents lacked bargaining power, the provisions are contained in contracts of adhesion, and the provisions are "extremely one-sided"—the focus of its claim was an allegation that Farmers had a uniform practice of informing its agents, prior to signing the Agreements, that it terminates contracts only for cause. In its closing argument, UFAA stressed the centrality of this alleged practice to its claim: "We are asking the court to declare that the three-month termination clause is unconscionable because agents are being told don't worry,

Farmers never enforces it."[9]  According to UFAA, this practice rendered every no-cause termination provision unconscionable because Farmers's representations constituted "substantive procedural deception," "negate[d] the reasonable expectations of the agent," and caused "unfair surprise."

To prove its claim at trial, UFAA presented representational testimony from several agents who said they were told something to the effect that Farmers terminates agencies only for cause.  Farmers, however, maintained it did not have a practice of making such representations, and presented testimony from numerous representatives to support that assertion.  After weighing this conflicting evidence, the trial court concluded UFAA failed to establish that Farmers had a uniform practice of informing agents that it terminates Agreements only for cause, a finding UFAA does not challenge on appeal.

This factual finding was fatal to UFAA's associational standing.  Absent a showing of a uniform practice, it was impossible for UFAA to establish its claim—that *every* no-cause termination provision is unconscionable—without presenting evidence regarding the specific representations made to each agent before he or she signed an Agreement.[10]  Given the need for individualized proof and participation of each agent, UFAA failed to satisfy the third *Hunt* requirement and lacked standing to

---

[9]    On appeal, UFAA continues to maintain this alleged practice is the crux of its unconscionability claim.

[10]    We acknowledge it may have been possible for UFAA to establish its unconscionability claim without evidence of Farmers's representations to agents.  UFAA, however, does not argue that point, and we consider it forfeited.

pursue its claim.[11]

### 3. UFAA Lacked Standing to Pursue its Claim Related to Sharing of Customer Information

UFAA also lacked associational standing to pursue its claim that the Agreements preclude Farmers from sharing with competitors customer information acquired by agents.[12] UFAA's claim was premised on an allegation that Farmers "systematically" shares such information with 21st Century, thereby interfering with the agents' business expectancies and violating the covenants of good faith and fair dealing contained in each Agreement. UFAA sought to establish its claim primarily through representative testimony from two agents, Robinson and Soberanes.

The trial court, however, found the agents' testimony showed, at most, "isolated incidents" of Farmers sharing information with 21st Century. Given this finding, which UFAA does not contest, UFAA could establish its claim—that Farmers

---

[11] Even if UFAA had standing, its unconscionability claim failed on the merits for a similar reason. As discussed above, UFFA sought a declaration that *every* no-cause termination provision is unconscionable, which was premised on an allegation that Farmers informed each agent that it terminates contracts only for cause. UFAA, however, does not dispute that it failed to present sufficient evidence that Farmers made such representations to each agent. Without such evidence, UFAA could not establish that *every* no-cause termination provision is unconscionable. Accordingly, it was not entitled to its requested relief.

[12] UFAA again failed to specifically address this issue in its appellate briefing, which has forfeited the point. Nonetheless, we will exercise our discretion to consider the merits of the issue.

is interfering with and violating each agent's business expectancies and contractual agreements—only by presenting, for each individual agent, evidence that Farmers improperly shares customer information procured by that agent. Because of the need for individualized proof and extensive participation from each agent, the court properly determined that UFAA lacked associational standing to pursue this claim.[13]

## II. UFAA Was Not Entitled to Declaratory Relief On Its Claims Related to Office Locations and Performance Standards

UFAA contends the trial court erred in refusing to declare that the Agreements preclude Farmers from terminating an agency based on its dissatisfaction with the agent's office location

---

[13] Even if UFAA had standing, it has not shown the trial court erred in denying its claim on the merits. The trial court rejected UFAA's claim after finding it presented "no admissible or credible evidence of any instance where customer information was disseminated to 21st Century" by Farmers. UFAA suggests this was error because Robinson's testimony established that Farmers shared her customers' information with 21st Century. According to UFAA, there is no possible way the customers could have failed to renew their policy with Robinson, and then obtained a new policy through 21st Century, unless Farmers shared their information. We disagree. The court could have reasonably inferred from the evidence that 21st Century independently solicited Robinson's customers, or the customers independently reached out to 21st Century. Accordingly, Robinson's testimony did not compel a finding in UFAA's favor. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 [where an issue on appeal turns on failure of proof, appellant's evidence must be of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding].)

21

or failure to meet performance standards.  As best we can tell, UFAA's primary argument is that consideration of such factors is improper because the Agreements do not expressly prohibit specific office locations or mandate performance standards.  We are not persuaded.

" 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.'  [Citations.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.'  [Citations.]  'If contractual language is clear and explicit, it governs.'  [Citation.]" (*State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195.)  We strive to "give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable." (*Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1507.)

UFAA is correct that that Agreements do not expressly prohibit specific office locations or require agents meet performance standards.  Nonetheless, Farmers may terminate agencies for such reasons pursuant to the no-cause termination provision.  Unlike the 30-day termination provision (which may be invoked only after a breach of the Agreement) and the no-notice termination provision (which may be invoked only if the agent engages in enumerated conduct), the no-cause termination provision does not require any conditions precedent.  The parties may invoke the provision and terminate the Agreement at any time, and for any or no reason, so long as they provide sufficient notice.  It follows that Farmers may terminate an agency under the no-cause termination provision for reasons not specifically listed in the Agreement, including dissatisfaction with the agent's office location or failure to meet performance standards.

22

UFAA's interpretation—that Farmers may terminate agencies only for reasons specifically listed in the Agreements—is unreasonable, as it renders the no-cause termination provision superfluous. The 30-day termination provision already allows the parties to terminate an Agreement for a breach. UFAA fails to explain how, under its interpretation, the no-cause termination provision would operate any differently, or why a party would ever invoke it rather than the 30-day termination provision.

UFAA suggests that allowing Farmers to terminate an agency for reasons other than those specifically listed in an Agreement would constitute a unilateral amendment to the Agreement. In support, it relies on the Nevada Supreme Court's decision in *MacKenzie Ins. v. National Ins.* (Nev. 1994) 110 Nev. 503. In that case, an insurance agency sued an insurer after the insurer unilaterally reduced the commission the agency would be paid from fifteen percent (pursuant to the terms of the agency agreement) to five percent. The trial court granted the insurer's motion for summary judgment, reasoning that, "since the relationship between [the agency] and [the insurer] was terminable by either party, with or without cause, the right of termination by written notice included the lesser right of imposing prospectively, changes in the conditions of the contract, including the terms of compensation." (*Id*. at p. 505.) The Nevada Supreme Court reversed, holding: "The trial court incorrectly ruled that either party to the written contract had the 'privilege of imposing prospectively, changes in the conditions of the contract.' [I]f this were true, and either party had actually had the 'privilege' of imposing unwanted changes in the contract on the other, then there would be no point in having a written contract which set the commission percentage agreed to be paid.

The contract gives the parties an option to terminate by giving written notice; it does not give either party the 'privilege of imposing' unilateral changes 'in the conditions of the contract.' [The agency] had the right to receive the fifteen percent commission rate agreed-upon by the parties until the contract was terminated in accordance with its terms, unless, of course, [the agency] waived the required written notice or agreed expressly or impliedly to accept less than was provided for in the written contract." (*Id.* at p. 506.)

*MacKenzie* is readily distinguishable. Unlike the insurance company's attempt to reduce the agency's commission in *MacKenzie*—which was contrary to the express terms of the parties' contract—Farmers has an explicit right under the Agreements to terminate an agency without cause. Further, there is nothing in the Agreements that precludes Farmers from exercising that authority in the event it is dissatisfied with an agent's office location or failure to meet performance standards. It is absurd to argue that Farmers's exercise of a specifically enumerated contractual right amounts to an attempt to unilaterally rewrite the contract.

UFAA also suggests, in perfunctory fashion, that an agent's office location may never be a basis for termination because the Agreements designate agents independent contractors and give them the right to determine the time, place, and manner in which the objectives of the Agreements are to be carried out. UFAA does not specifically address, in any meaningful way, how these provisions constrain Farmers's authority under the no-cause termination provisions.[14] Consequently, we consider the point

[14] UFAA suggested in its complaint that Farmer's termination authority is limited by the implied covenant of good

24

forfeited. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1240, fn. 18.)

Even if we overlook the forfeiture, we do not agree that these provisions preclude Farmers from ever terminating an Agreement because of the agent's office location. An agent's authority to determine the time, place, and manner in which the objectives of the Agreement are to be carried out is expressly qualified by the requirement that the agent "conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents." Therefore, even setting aside the no-cause termination provisions, Farmers may terminate an Agreement if the agent's office location violates state or federal law or does not conform to "normal good business practice."

UFAA maintains that the phrase "normal good business practice" is ambiguous, and therefore should be interpreted against Farmers, which drafted the contract. UFAA, however, does not provide even a hint as to what we should interpret the phrase to mean. Instead, it merely points to evidence that operating an agency out of a personal residence may constitute a "normal good business practice" under certain circumstances. While that may be true, it does not help UFAA, as it implies there are circumstances under which operating an agency out of a personal residence is not a "normal good business practice." If so, the Agreements cannot be said to categorically forbid Farmers from terminating an agency based on an agent's office location, as

faith and fair dealing. UFAA, however, makes only passing reference to the implied covenant in its reply brief, and provides no meaningful analysis or authority on the issue.

25

UFAA contends.

Nor are we persuaded that Farmers's authority to terminate an agency if dissatisfied with the agent's office location is necessarily inconsistent with the agents' designation as independent contractors. As UFAA correctly points out, an employer generally may exercise control over an independent contractor's results, but not the means by which the results are accomplished. (*S.A. Gerrard Co. v. Industrial Acc. Com.* (1941) 17 Cal.2d 411, 413; accord *Varisco v. Gateway Science & Engineering, Inc.* (2008) 166 Cal.App.4th 1099, 1103.) Nonetheless, an employer of an independent contractor may "retain some interest in the manner in which the work is done" without altering the relationship. (*Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 432; see *Bates v. Industrial Acc. Com.* (1958) 156 Cal.App.2d 713, 718 ["Complete abnegation of control is not essential to the establishment of the status of independent contractor."].) Accordingly, the fact that Farmers may have some limited control over the agents' office locations does not necessarily render the agents something other than independent contractors.[15]

## III. UFAA's Single Enterprise Arguments Are Moot

UFAA contends the trial court erred in finding it failed to establish that FGI and the Companies are a single enterprise. It also contends the court erroneously excluded expert testimony

---

[15] To determine whether our interpretation of the Agreements actually alters the agents' purported status as independent contractors would require consideration of numerous additional factors. (See *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 351.) Because UFAA failed to discuss, or even acknowledge, any of those factors, we decline to consider the issue any further.

26

on the issue.  Because we conclude UFAA failed to establish its entitlement to relief on any of its claims, these arguments are moot and we need not consider them.

## IV.    UFAA's Arguments Related to the Motion for New Trial Are Meritless

UFAA contends the trial court erred in denying its motion for new trial.  In support, it simply rehashes its arguments related to standing and the merits of its claims.  We reject the arguments for the reasons discussed above.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.

We concur:


GRIMES, J.


WILEY, J.

27